UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| O.Z. MARTIN,<br><br>            Plaintiff,<br><br>     v.<br><br>DR. PETRAS, et al.,<br><br>            Defendants. | No.  2:20-cv-1536 WBS CKD P<br><br>FINDINGS AND RECOMMENDATIONS |

Plaintiff is a California prisoner proceeding pro se with an action for violation of civil rights under 42 U.S.C. § 1983.  This action proceeds on claim 1 in plaintiff's amended complaint (ECF No. 15).  In that claim, plaintiff asserts defendants, Doctors Liu, Petras and Ota, violated his Eighth Amendment rights by being deliberately indifferent to plaintiff's serious medical needs. Dr. Liu is employed at San Joaquin General Hospital.  Dr. Petras and Dr. Ota are employed by the California Department of Corrections and Rehabilitation (CDCR) at the California Medical Facility (CMF).   All three defendants have filed motions for summary judgment (ECF Nos. 91 and 92).

I.  Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party asserting that a fact cannot be disputed must support the assertion by

1

1  "citing to particular parts of materials in the record, including depositions, documents,
2  electronically stored information, affidavits or declarations, stipulations (including those made for
3  purposes of the motion only), admissions, interrogatory answers, or other materials. . ." Fed. R.
4  Civ. P. 56(c)(1)(A).

5        Summary judgment should be entered, after adequate time for discovery and upon motion,
6  against a party who fails to make a showing sufficient to establish an element essential to that
7  party's case, and on which that party will bear the burden of proof at trial. See Celotex Corp. v.
8  Catrett, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element
9  of the nonmoving party's case necessarily renders all other facts immaterial." Id.

10        If the moving party meets its initial responsibility, the burden then shifts to the opposing
11  party to establish that a genuine issue as to any material fact actually does exist. See Matsushita
12  Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the
13  existence of this factual dispute, the opposing party may not rely on the allegations or denials of
14  their pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or
15  admissible discovery material, in support of its contention that the dispute exists or show that the
16  materials cited by the movant do not establish the absence of a genuine dispute. See Fed. R. Civ.
17  P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must show that the fact in
18  contention is material, i.e., a fact that might affect the outcome of the suit under the governing
19  law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v.
20  Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is
21  genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving
22  party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

23        In the endeavor to establish a factual dispute, the opposing party need not establish a
24  material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be
25  shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."
26  T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the
27  pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"
28  /////

Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. That said, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

## II. Plaintiff's Allegations

Essentially, plaintiff makes two allegations:

1. Defendants caused plaintiff's prostate cancer by prescribing Finasteride for an enlarged prostate.

2. Defendants caused the diagnosis of prostate cancer to be delayed.

## III. Medical Care Under the Eighth Amendment

The Eighth Amendment protects prisoners against cruel and unusual punishment. Denial of appropriate medical care for a prisoner's serious medical needs can amount to cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). A violation of the Eighth Amendment occurs when a prison employee causes injury by being at least deliberately indifferent to a prisoner's serious medical needs. The deliberate indifference standard is met with either a purposeful act or failure to act. Id. A showing of merely negligent medical care is not enough to establish a violation of the Eighth Amendment. Frost v. Agnos, 152 F.3d 1124, 1130 (9th Cir. 1998), citing Estelle, 429 U.S. at 105-106. A difference of opinion about the proper course of treatment is not deliberate indifference, nor does a dispute between a prisoner and prison officials over the necessity for or extent of medical treatment amount to a constitutional

violation. See, e.g., Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

IV. Analysis

    A. Finasteride

Plaintiff took Finasteride between June of 2017 and October of 2018. ECF No. 15 at 13. Plaintiff was diagnosed with prostate cancer on September 21, 2018, following a biopsy. Id. at 17. Plaintiff alleges Finasteride caused his prostate cancer. However, there is no evidence before the court that Finasteride caused his cancer or even causes cancer. In fact, the opposite appears to be true. Defendants point to a study (ECF No. 91-2 at 127-133) where 10.5% of participants given Finasteride developed prostate cancer as did 14.9% of persons given placebo. While the study indicates that 3.5% of those taking Finasteride developed high grade cancer such as plaintiff's as opposed to 3% of those that took placebo, the difference was deemed insignificant and possibly due to chance. Id. at 131. Another possibility for the increase is that Finasteride makes higher-grade cancers easier to detect as opposed to causing cancer. Id. at 127. Both motions for summary judgment include declarations from urologists citing the conclusions reached in this study. ECF No. 91-2 at 195; 92-3. Plaintiff fails to point to any evidence refuting any of the above.

Because plaintiff fails to point to anything suggesting that he suffered any negative consequences from taking Finasteride, defendants were not deliberately indifferent to a serious medical need for prescribing it.[1]

    B. Earlier Detection

Plaintiff blames all three defendants for causing his prostate cancer to not be detected sooner. Plaintiff alleges Dr. Petras was plaintiff's primary care physician between December of 2015 and December of 2017. Plaintiff asserts that during that period, Dr. Petras performed no

---

[1] At various places in the record, plaintiff complains about not being warned that Finasteride increases the odds of developing high-grade prostate cancer. Failure to warn that Finasteride increases the odds of developing high-grade prostate cancer in the neighborhood of .5% is simply not cruel and unusual punishment. See, e.g., Burgess v. Mar, 395 Fed.Appx. 368 (9th Cir. 2010) (failure to warn prisoner of potential side effects of medicine constitutes negligence at most, not deliberate indifference).

1  digital examination of plaintiff's prostate and delayed referral to a urologist despite plaintiff's
2  consistent complaints of rectal pain, difficulty urinating, and elevated prostate specific antigen
3  (PSA) levels. ECF No. 15 at 14.  Plaintiff met with Dr. Liu, a urologist, on May 25, 2017, for
4  benign prostatic hyperplasia (enlarged prostate).  Dr. Liu simply prescribed Finasteride after
5  plaintiff made the same complaints identified above. Id. at 15.  Dr. Ota took over as plaintiff's
6  primary care physician in December of 2017. Id. at 18.  Plaintiff made the same complaints to
7  Dr. Ota that he made to Dr. Liu and Dr. Petras.  Dr. Ota did not perform a digital exam of
8  plaintiff's prostate, and delayed referral to a urologist until September 21, 2018, when plaintiff
9  met with Dr. Hsieh.  Dr. Hsieh performed a digital exam and then a biopsy which indicated
10 prostate cancer. Id. at 17.  Plaintiff's prostate was removed on January 19, 2019.  ECF No. 92-5,
11 EX. K.  Nothing in the record suggests plaintiff has any cancer remaining.

  First, plaintiff fails to point to any evidence suggesting when his prostate cancer would have been detectable.  Second, the evidence before the court indicates plaintiff's cancer was not detectable without the biopsy that was performed by Dr. Hsieh and plaintiff fails to point to anything suggesting any defendant was at least deliberately indifferent for not causing a biopsy to be performed before it was.

  One issue is worthy of further discussion.  Plaintiff alleges that when he was seen by Dr. Liu on May 25, 2017, their interaction was cursory.  But Dr. Liu's declaration and medical records show otherwise.   In his declaration, Dr Liu indicates as follows:

> [Plaintiff] complained of trouble urinating, severe bladder outlet symptoms, and symptoms related to BPH (benign prostatic hyperplasia or enlarged prostate gland).  At the time of my initial encounter with Mr. Martin, he was already taking the BPH medication Tamsulosin which was prescribed by another provider.  Mr. Martin advised that the Tamsulosin was not relieving his BPH symptoms.  I noted Martin's last prostate-specific antigen test (or PSA test) was 5.0 ng/ml. I also performed a physical examination of Mr. Martin which included a rectal examination. The findings of my rectal examination were normal except for an enlarged prostate gland.
>
> Based on Mr. Martin's history, symptoms and physical examination, my assessment and plan was to prescribe Mr. Martin with the BPH medication Finasteride in conjunction with Tamsulosin. Finasteride and Tamsulosin are commonly prescribed together for the treatment of BPH. I advised Mr. Martin that if conservative treatment through

5

> these medications did not resolve his BPH symptoms, we would consider a TURP (transuretheral resection of the prostate). I recommended that Mr. Martin return for follow-up in 3 months. Mr. Martin agreed with my recommendations and treatment plan.
>
> I strongly disagree with Mr. Martin's allegations that I did not enter the examination room or perform a physical examination on May 25, 2017. My May 25, 2017 note confirms I performed a physical examination of Mr. Martin's head, eyes, ears, throat, penis, urethral meatus, scrotum, testicles and rectal examination. Specifically, my note documents Mr. Martin's rectal examination revealed normal findings, aside from a 3+ benign prostate. Reference to "3+" indicates my rectal examination confirmed Mr. Martin had an enlarged prostate gland. Reference to "benign" means my rectal examination of Mr. Martin found no lumps, palpable nodules or abnormalities concerning for cancer.

ECF No. 92-4 at 2-3. Medical records attached to Dr. Liu's declaration are consistent with the declaration. ECF No. 92-4 at 5-7. Plaintiff claims that this evidence is mostly fabricated.

Even if the court assumes Dr. Liu's treatment was as limited as plaintiff suggests, however, nothing before the court indicates that plaintiff suffered any actionable injury as a result. Again, plaintiff fails to point to anything suggesting his cancer was detectable when plaintiff was seen by Dr. Liu. Plaintiff also fails to point to any evidence indicating that even if Dr. Liu's examination of plaintiff was as plaintiff alleges, Dr. Liu was at least deliberately indifferent to plaintiff's condition. Evidence before the court indicates the rectal examination performed by Dr. Hsieh did not suggest cancer.[2] ECF No. 92-3 at 7. Dr. Patrick Bennett indicates in his declaration that even if Dr Liu did not conduct a rectal exam on May 25, 2017, a biopsy would not have been within the standard of care given plaintiff's PSA score at the time and other factors including plaintiff's condition: "Dr. Liu recommended appropriate treatment of

---

[2] In his opposition, plaintiff claims that Dr. Hsieh told him that the rectal exam revealed a "rough area on his prostate." ECF No. 96-1 at 10. The statement allegedly made by Dr. Hsieh constitutes inadmissible hearsay under Federal Rules of Evidence 800-807. Furthermore, there is nothing before the court suggesting that detection of a rough area on the prostate warrants a biopsy under the applicable standard of care. Finally, the records generated after Dr. Hsieh's rectal exam reveal no prostate abnormalities. Specifically, Dr. Hsieh noted plaintiff's prostate was "30 grams, smooth, non tender, no nodules." ECF No. 91-2 at 87. The records also indicate no abnormalities were discovered until the cystoscopy resulting in the retrieval of samples of plaintiff's prostate was conducted. Id. at 88. Before samples were retrieved, Dr. Hsieh observed through a camera a "median lobe that protrudes slightly into the bladder." Id. at 88.

the severe presenting symptoms as well as follow-up in three months to assess his response to therapy." ECF No. 92-3 at 7-8.

V. Conclusion

Because there is no genuine issue of material fact as to whether any remaining defendant caused plaintiff injury by being at least deliberately indifferent to plaintiff's serious medical needs, the two motions for summary judgment before the court should be granted.[3]

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Dr. Liu's motion for summary judgment (ECF No. 92) be GRANTED;

2. Dr. Petras and Dr. Ota's motion for summary judgment (ECF No. 91) be GRANTED; and

3. This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  January 25, 2025

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

---

1 mart1536.msj

---

[3] Defendants also argue they are entitled to summary judgment based on the qualified immunity doctrine.  Because there is no genuine issue of material fact as to whether any defendant's conduct violated a clearly established constitutional right, summary judgment based on qualified immunity is also appropriate.  Saucier v. Katz, 533 U.S. 194, 201 (2001).